# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77319-4-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| CHRISTINA SHARA KAESTNER, | ) | |
| | ) | FILED: June 3, 2019 |
| Appellant. | ) | |

VERELLEN, J. — Christina Kaestner appeals her convictions of felony hit and run, theft of a motor vehicle, and two counts of vehicular assault. She also appeals her exceptional sentence. The majority of Kaestner's appeal focuses on the vehicular assault of Claire Schwartz. Shortly before trial, Kaestner's defense counsel discovered her brother-in-law's half-brother's son was dating Schwartz. Defense counsel and Schwartz's boyfriend are not related, and they did not otherwise have a close relationship. Because there was no actual conflict that adversely affected defense counsel's performance, Kaestner's Sixth Amendment right to conflict-free counsel was not violated.

Also before trial, Kaestner orally moved to represent herself. After making the initial motion, Kaestner refused to answer further questions and never raised the motion again. Because Kaestner's motion was not unequivocal, the court did

not abuse its discretion when it failed to grant her request to proceed pro se. Even assuming the request was unequivocal and timely, Kaestner failed to demonstrate her waiver of the right counsel was knowing and intelligent.

Following trial, the jury found Kaestner guilty of all counts. The jury found the vehicular assault of Schwartz was aggravated because Schwartz's injuries substantially exceeded the level of harm necessary to prove the offense. Schwartz suffered multiple fractures and a traumatic brain injury. The jury also found all the offenses were aggravated because Kaestner committed the crimes shortly after being released from incarceration. Kaestner committed the charged offenses three days after being released from jail.

Kaestner challenges both aggravators as unconstitutionally vague. But a person of reasonable understanding would not have to guess about the meaning of the aggravators, as applied in this setting. Kaestner also argues the State failed to present sufficient evidence to support both aggravators. But viewed in a light most favorable to the State, there is sufficient evidence to support both aggravators.

The question whether the facts found by the jury concerning the two aggravators were substantial and compelling reasons justifying an exceptional sentence is a question of law which the jury was not required to address. And the sentence of 100 months for the vehicular assault of Schwartz on the standard sentence range of 43 to 57 months was not clearly excessive.

Finally, we accept the State's concession that the $100 DNA[1] fee is not warranted because Kaestner's DNA was collected on a prior conviction.

We affirm Kaestner's conviction and sentence but remand for the trial court to strike the $100 DNA fee.

## FACTS

Kaestner was released from incarceration on April 21, 2016. On April 23, 2016, Kaestner met Bryan Brown in Everett. Brown agreed to give Kaestner a ride to North Bend. On April 24, 2016, Brown drove Kaestner to North Bend but eventually brought her back to his jobsite in Seattle. After finishing work and before driving Kaestner back to North Bend, Brown met a friend in a parking lot. Kaestner remained in Brown's truck. After Brown walked away, Kaestner got into the driver's seat and sped away.

After driving erratically for a few minutes, Kaestner t-boned a Toyota Corolla and collided with a Honda Accord. Eventually, Kaestner lodged the truck between a building and a utility pole. Police arrived and arrested Kaestner. The driver of the Corolla, Claire Schwartz, had several fractured facial bones, a fractured clavicle, a fractured pelvic bone, and a traumatic brain injury, among other things.

The State charged Kaestner with theft of a motor vehicle, reckless driving, felony hit and run, and two counts of vehicular assault. The State alleged one of the counts of vehicular assault was aggravated because Schwartz's severe

---

[1] Deoxyribonucleic acid.

injuries substantially exceeded the level of bodily harm necessary to prove vehicular assault. The State also alleged all of the charged counts were aggravated because they were committed shortly after Kaestner was released from incarceration.

On January 30, 2017, Kaestner orally moved to represent herself before Judge Dean Lum. After Kaestner gave confusing answers to Judge Lum's questions about her ability to represent herself, Judge Lum told Kaestner they would address her motion the next day after she had the night to think.

The next hearing was on February 2, 2017, before Judge Sean O'Donnell.[2] Kaestner refused to answer the court's questions concerning her request to proceed pro se. In response, the court stated, "I'm going to take your silence as that you're thinking about it and you're not sure."[3] Kaestner did not respond, and she never renewed the motion.

On May 10, 2017, the parties appeared before Judge Susan Amini for preliminary motions. Defense counsel disclosed that over the weekend, while at her niece's birthday party, counsel had discovered that she knew the boyfriend of Schwartz, one of the victims. Schwartz's boyfriend's parents are counsel's brother-in-law's half-brother and his wife. Defense counsel represented that she

---

[2] See Report of Proceedings (RP) (Feb. 2, 2017) at 31 ("Ms. Kaestner was here on Monday and asserted her right to represent herself. . . . We were going to readdress that motion today. So it was rolled without—the hearing was rolled already without a speedy trial waiver.").

[3] Id. at 37.

4

saw Schwartz's boyfriend's parents at similar events once or twice a year, "but they're not people who I see regularly."[4] Defense counsel could not recall the last time she saw Schwartz's boyfriend.

When the court asked Kaestner how she felt about the situation, Kaestner stated,

> I don't really have anything to say. I don't—I'm just frustrated, because I've been in jail for a year, and I haven't seen my children in like three years, so I'm just hoping to get it resolved as soon as possible.[5]

The court concluded there was no actual conflict that precluded counsel's continued representation of Kaestner.

The trial was before Judge Mariane Spearman. On June 19, 2017, after the initial trial, the jury found Kaestner guilty as charged. The jury also found the vehicular assault of Schwartz was aggravated because Schwartz's injuries substantially exceeded the level of bodily harm necessary to prove vehicular assault. On June 20, 2017, after a separate proceeding on the rapid recidivism aggravating factor, the jury found each felony was aggravated because they were committed shortly after Kaestner was released from incarceration.

At sentencing, the court ruled the jury's findings as to the aggravating factors were substantial and compelling reasons to impose an exceptional

---

[4] RP (May 10, 2017) at 343.

[5] Id. at 348-49.

sentence. The court imposed an exceptional sentence of 100 months on the vehicular assault of Schwartz.

Kaestner appeals.

## ANALYSIS

### I. Right to Conflict-Free Counsel

Kaestner argues she is entitled to a new trial because the court violated her Sixth Amendment right to conflict-free counsel.

In all criminal cases, the Sixth Amendment to the United States Constitution gives defendants "the right . . . to have the assistance of counsel for his defense."[6] This includes the right to an attorney who is free from any conflict of interest.[7] An actual conflict of interest means "'a conflict that affected counsel's performance— as opposed to a mere theoretical division of loyalties.'"[8] "The defendant bears the burden of proving that there was an actual conflict that adversely affected his or her lawyer's performance."[9]

Washington's Rule of Professional Conduct (RPC) 1.7(a)(2) provides, "[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially

---

[6] U.S. Const. amend. VI.

[7] State v. Dhaliwal, 150 Wn.2d 559, 566, 79 P.3d 432 (2003).

[8] Id. at 570 (quoting Mickens v. Taylor, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)).

[9] Id. at 573.

limited . . . by a personal interest of the lawyer." In In re Personal Restraint of Stenson, our Supreme Court stated that a personal interest "largely concerns financial or familial interests, as shown by RPC 1.8"[10] RPC 1.8 references a "close, familial relationship."[11] RPC 1.7 and 1.8 address actual conflicts and not the appearance of a potential conflict.[12] Therefore, to determine whether a lawyer has a conflict of interest due to a "familial interest," we must determine the closeness of the relationship.

Shortly before trial, on May 10, 2017, defense counsel disclosed that over the weekend she had discovered that she knew Schwartz's boyfriend. Schwartz's boyfriend's parents are counsel's brother-in-law's half-brother and his wife. Defense counsel represented that she saw Schwartz's boyfriend's parents once or twice a year, "but they're not people who I see regularly."[13] The mother of Schwartz's boyfriend asked defense counsel about her work, and defense counsel mentioned she was in trial for "a motor vehicle accident case."[14] The woman asked if the case involved Schwartz and the following exchange occurred,

> [M]y first reaction was, What? Like how would it—why would she even ask me that question? And then it occurred to me that I did remember, sort of the bell went off in my head, that her husband, the boyfriend's father, had told me last year at the earlier birthday party of my niece, that—that his son's girlfriend had been involved in an

---

[10] 142 Wn.2d 710, 722, 16 P.3d 1 (2001).

[11] See RPC 1.8(c) and (l).

[12] Compare with Code of Judicial Conduct (CJC) Rule 1.2 ("A judge . . . shall avoid . . . the *appearance* of impropriety.") (emphasis added).

[13] RP (May 10, 2017) at 343.

[14] Id.

accident and that she had been injured. I think she may have still been in the hospital at that time. I can't recall. And you know, I expressed sympathy, and I think he mentioned, I'm sure he mentioned her name. I expressed . . . my sympathy about that, and that was, that was it.

But when his wife this year said the name Claire, it kind of came back to me. It . . . was the first time that I had thought about it at all during the course of this, my representation of Ms. Kaestner . . . or else I would have raised it a long time ago to Ms. Kaestner, probably to the criminal presiding, to counsel, to make sure that everyone knew this. So when she asked if it was Claire's trial, I said, Yes, in fact, it is. And I said, So, you know, we shouldn't, you know, discuss this. And that was it. We didn't discuss it.[15]

Defense counsel indicated she raised the issue out of "an abundance of caution" but did not believe that the situation raised a concurrent conflict under RPC 1.7.[16] Defense counsel also stated, "I see absolutely no reason why this would cause me any hesitation at all professionally to continue on with my representation of Ms. Kaestner."[17] When the court inquired into the relationship between defense counsel and the victim's boyfriend's parents, defense counsel represented, "I'm related to them in a very tenuous, by marriage, kind of a way."[18] Defense counsel also stated she could not remember the last time she had seen the victim's boyfriend.

The following exchange occurred between the court, defense counsel, and Kaestner:

---

[15] Id. at 344.

[16] Id. at 345.

[17] Id.

[18] Id. at 346.

THE COURT: Ms. Kaestner, is there anything of this issue you would like to say? What is—what is your position? Do you have any concerns? Do you—what do you want to see?

DEFENSE COUNSEL: I think that the basic issue is whether or not I would remain as your counsel.

THE COURT: Yes.

DEFENSE COUNSEL: I think that's essentially what the Court's asking you. Are you able to tell the Court how you feel about that?

KAESTNER: I don't really have anything to say. I don't—I'm just frustrated, because I've been in jail for a year, and I haven't seen my children in like three years, so I'm just hoping to get it resolved as soon as possible.

THE COURT: Okay. Do you have any objections to Ms. Exe continuing as your lawyer?

KAESTNER: I don't, I don't know what to say. I don't have anything to say.

THE COURT: Well, either you feel comfortable or you don't. Which one is it?

KAESTNER: Um –

DEFENSE COUNSEL: Your Honor, I think I can say without revealing client confidences that, that I did explain to Ms. Kaestner what would happen if I were to no longer be her attorney. And to be fair to her, I explained to her that she would get a new lawyer.

THE COURT: Yes.

DEFENSE COUNSEL: And that that new lawyer would probably take some time to get up to speed. So my sense is that perhaps her hesitation about answering this question is that she really wants this to be over with. And she knows that if I'm not her lawyer any longer, that there will be additional delay that will be out of anyone's hands.

So perhaps the question is whether you're actually comfortable with me or you just want me to stay on because you don't want any more delays. Okay. Are you able to answer that question, maybe?

KAESTNER: Well, obviously I'm interested in something happening. I mean, I don't want to sit in jail for the rest of my life here, you know. So you know, it's upsetting to hear something else come up, but I don't really know any —[19]

The court concluded there was no actual conflict that precluded defense counsel's continued representation of Kaestner.

While the jury was deliberating on the rapid recidivism aggravating factor, Kaestner mentioned her concern that her defense counsel "had some conflict of interest."[20] Judge Spearman confirmed Judge Amini had already addressed this issue.

Kaestner's defense counsel's relationship with Schwartz's boyfriend and his parents is not a familial interest under RPC 1.7. Defense counsel's brother-in-law's half-brother's son is not a member of defense counsel's family. And the connection between defense counsel and Schwartz's boyfriend is not otherwise a close relationship. Defense counsel testified that she could not remember the last time she had seen Schwartz's boyfriend and that she saw the boyfriend's parents only once or twice a year. Defense counsel also testified that she did not discuss the case with Schwartz's boyfriend's parents, outside of confirming that her trial did involve Schwartz. This undisputed testimony does not reveal a close relationship between defense counsel and Schwartz's boyfriend or his parents. As

---

[19] Id. at 348-50.

[20] RP (June 20, 2017) at 641-42.

a result, there is no actual conflict that precluded defense counsel from representing Kaestner.

Additionally, there is no showing that the connection between defense counsel and Schwartz's boyfriend adversely affected defense counsel's performance. Kaestner argues defense counsel's performance was adversely affected because she did not cross-examine Schwartz and she did not challenge the substantially exceeds aggravator. But Kaestner fails to establish that defense counsel's trial strategy hampered her defense or caused some lapse in representation contrary to her interests.[21] It was a reasonable strategy for defense counsel to avoid cross-examining Schwartz in an attempt to minimize the severity of her injuries.

Kaestner's argument is premised on the assumption that if defense counsel had established Schwartz's injuries were not permanent, the substantially exceeds aggravator would have failed. But as discussed below, the State is not required to prove the victim's injuries were permanent to show those injuries substantially exceeded substantial bodily harm. And there was a genuine risk that cross-examining the victim or other witnesses about the severity of her injuries might generate sympathy for the victim.

---

[21] See State v. Robinson, 79 Wn. App. 386, 395, 902 P.2d 652 (1995) (quoting State v. Lingo, 32 Wn. App. 638, 646, 649 P.2d 130 (1982)).

We conclude there was no actual conflict of interest that adversely affected defense counsel's performance. The court did not violate Kaestner's Sixth Amendment right to conflict-free counsel.

Kaestner also argues the court failed to conduct an adequate inquiry into the potential conflict. We agree. The court did not conduct any meaningful inquiry. But under these circumstances, reversal is not required because Kaestner cannot show an actual conflict that adversely affected defense counsel's performance.[22]

## II. Right to Self-Representation

Kaestner also contends she is entitled to a new trial because the court violated her right to self-representation.

We review a lower court's decision to grant or deny a defendant's request to proceed pro se for abuse of discretion.[23] "Under an abuse of discretion standard, we do not reverse a trial court's decision unless the trial court applied the wrong legal standard, based its decision on facts unsupported by the record, or made a decision that is manifestly unreasonable."[24]

---

[22] See Dhaliwal, 150 Wn.2d at 568, 574 (A defendant is not "automatically entitled to reversal based on the court's failure to inquire fully into the possible conflict." Although the trial court failed to conduct an adequate inquiry, reversal was not required because "Dhaliwal . . . failed to demonstrate the strong possibility that a conflict of an interest had an effect on [defense counsel's] performance.").

[23] State v. Curry, 191 Wn.2d 475, 483, 423 P.3d 179 (2018).

[24] Id. at 486.

The Washington State Constitution and the United States Constitution grant criminal defendants the right to self-representation.[25] But this right is in tension with a defendant's right to the assistance of counsel.[26] "Because of this tension, a defendant must unequivocally request to proceed pro se before he or she will be permitted to do so."[27] Even if a defendant makes an unequivocal and timely request, in order to grant a defendant's request to proceed pro se, the court must establish that a defendant makes a voluntary, knowing, and intelligent waiver of the right to counsel.[28] "[T]he record must reflect that the defendant understood the seriousness of the charge, the possible maximum penalty involved, and the existence of technical procedural rules governing the presentation of his defense."[29] The court shall indulge "'every reasonable presumption against a defendant's waiver of his or her right to counsel.'"[30]

On January 30, 2017, before Judge Lum, Kaestner orally moved to proceed pro se, "I wanted to ask if I could represent myself."[31] Judge Lum asked Kaestner whether she had any experience representing herself. Kaestner informed the

---

[25] Id. at 482.

[26] Id.

[27] Id. at 482-83.

[28] Id. at 483 (quoting State v. DeWeese, 117 Wn.2d 369, 377, 816 P.2d 1 (1991)).

[29] DeWeese, 117 Wn.2d at 378.

[30] State v. Madsen, 168 Wn.2d 496, 504, 229 P.3d 714 (2010) (internal quotation marks omitted) (quoting In re Det. of Turay, 139 Wn.2d 379, 396, 986 P.2d 790 (1999)).

[31] RP (Jan. 30, 2017) at 18.

court that she had previously represented herself in a family law matter. When the court asked how this would be different, Kaestner responded, "It's criminal versus family law . . . [a]nd it's a different courtroom."[32] Kaestner stated she wanted to proceed pro se "[b]ecause I've been here for nine months and I've went through four attorneys, and I really want to expedite my case."[33]

The court reminded Kaestner of the charges against her and the standard sentencing range: "We're talking about some very serious allegations here and potential that, you know, if you're convicted, you might be going to prison for five years or longer."[34] Kaestner indicated she understood the seriousness of the crimes charged. The court asked Kaestner, "So how are you going to represent yourself on these charges?"[35] Kaestner replied, "I'm going to work with the prosecutor and go to court and go to trial."[36]

The court also inquired into Kaestner's knowledge of criminal law and procedure. When the court asked Kaestner about the rules of evidence, Kaestner replied, "I'm going to probably need to get out of my cell and go to the library and stuff, you know."[37] When asked about how she would file a suppression motion, Kaestner replied, "I would write it up and send it off. . . . I would sent it to whoever I

---

[32] Id. at 19.

[33] Id.

[34] Id. at 23.

[35] Id.

[36] Id.

[37] Id. at 24.

need to send it to."[38] Kaestner also stated, "[I]f it's too hard for me, I'll just get an attorney."[39] The court informed Kaestner, "[I]f you asked for an attorney to be appointed for you, you're in over your head, you might not get one."[40] Kaestner acknowledged representing herself would be "a lot of work."[41] The court stated, "It's very clear to me you don't understand what you're getting into right now, and that's why I'm going to have you sleep on this for an evening."[42] The court provided Kaestner a waiver of counsel form and instructed her to review the form.

The next hearing was on February 2, 2017, before Judge O'Donnell. The court attempted to address Kaestner's motion to proceed pro se. Initially, Kaestner refused to attend court. Due to speedy trial concerns, the court issued a reasonable force order to secure Kaestner's attendance. The court asked Kaestner whether she wanted more time to think about representing herself. Kaestner did not respond. The court asked, "Are you thinking, or are you just wanting to be silent?"[43] Again, Kaestner did not respond. The court stated, "I'm going to take your silence as that you're thinking about it and you're not sure."[44] Kaestner did not respond, and she never raised the issue again.

---

[38] Id.

[39] Id. at 25.

[40] Id.

[41] Id. at 26.

[42] Id.

[43] RP (Feb. 2, 2017) at 36-37.

[44] Id. at 37.

Kaestner argues the court violated her right to self-representation because Judge Lum deferred the issue. But "[e]ven if a request is unequivocal, timely, voluntary, knowing, and intelligent, a court may defer ruling if the court is reasonably unprepared to immediately respond to the request."[45] Given the presumption against a defendant's waiver of his or her right to counsel, the court reasonably deferred Kaestner's motion when it determined she had not fully considered the consequences of proceeding pro se.

Kaestner's request was timely because it was made before the jury was impaneled. But her request was equivocal. On January 30, 2017, before Judge Lum, Kaestner indicated, "[I]f it's too hard for me, I'll just get an attorney."[46] And on February 2, 2017, Kaestner again exhibited hesitation when she refused to answer Judge O'Donnell's questions.

Even if Kaestner's request was timely and equivocal, her dialogue with Judge Lum on January 31, 2017 and her silence on February 2, 2017 before Judge O'Donnell evidences that her request was not knowing or intelligent. Although Kaestner indicated she understood the seriousness of her charges and the possible maximum penalty, Kaestner did not understand the technical procedure rules governing her case. Kaestner did not have any history of representing herself in a criminal matter. She was unaware of the rules of evidence, and she did not know how to file a motion. And most problematic,

---

[45] Madsen, 168 Wn.2d at 504.

[46] RP (Jan. 30, 2017) at 25.

16

Kaestner incorrectly assumed she would be able to get an attorney if it was too hard for her to represent herself.

We conclude the court did not abuse its discretion when it failed to grant Kaestner's equivocal request to proceed pro se.

III. Aggravating Factors

Kaestner makes various challenges to the aggravating factors found by the jury.

The jury found the vehicular assault of Schwartz was aggravated under RCW 9.94A.535(3)(y) because the injuries inflicted upon Schwartz substantially exceeded the level of bodily harm necessary to prove vehicular assault. The jury also found all of the charged felonies were aggravated under RCW 9.94A.535(3)(t) because Kaestner committed the felonies shortly after she was released from incarceration.

a. Impermissibly Vague

Kaestner contends sections (y) and (t) of RCW 9.94A.535(3) are unconstitutionally vague.

"The due process clauses of the Fifth Amendment and the Fourteenth Amendment to the United States Constitution require that statutes afford citizens a fair warning of prohibited conduct."[47] "A statute is unconstitutionally vague if (1) 'it fails to define the offense with sufficient precision that a person of ordinary

---

[47] State v. Murray, 190 Wn.2d 727, 736, 416 P.3d 1225 (2018).

intelligence can understand it,' or (2) 'it does not provide standards sufficiently specific to prevent arbitrary enforcement.'"[48]

RCW 9.94A.535(3) contains "an exclusive list of factors that can support a sentence above the standard range." Section (y) provides for an exceptional sentence when "[t]he victim's injuries substantially exceed the level of bodily harm necessary to satisfy the elements of the offense." "Substantial bodily harm" is an element of vehicular assault.[49] RCW 9A.04.110(4)(b) defines "substantial bodily harm" as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part."

In State v. Duncalf, the defendant raised a due process vagueness challenge to section (y).[50] In Duncalf, the victim's "injuries include[d] substantial impairment of the function of his lower jaw and lip that is likely permanent."[51] Our Supreme Court determined:

> A person of reasonable understanding would not have to guess that causing such permanent injuries—injuries significantly greater than those contemplated by the legislature in defining "substantial bodily harm"—might subject him to a sentence above the standard range.[52]

---

[48] Id. (internal quotation marks omitted) (quoting State v. Duncalf, 177 Wn.2d 289, 296-97, 300 P.3d 352 (2013)).

[49] RCW 46.61.522.

[50] 177 Wn.2d 289, 300 P.3d 352 (2013).

[51] Id. at 297.

[52] Id.

Here, Kaestner distinguishes <u>Duncalf</u> and argues section (y) is unconstitutionally vague as applied to her because Schwartz's injuries were not permanent. But the language of RCW 9.94A.535(3)(y) does not require that the victim's injuries are permanent. And <u>Duncalf</u> does not create such a bright line rule.

Moreover, to show a victim's injuries substantially exceed the level of bodily harm necessary to prove the offense, the State is not required to establish that the victim's injuries reach the severity of the next category.[53] To prove vehicular assault, the State must prove the victim suffered "substantial bodily harm." The next category is "great bodily harm."[54]

Schwartz had several fractured facial bones, a fractured clavicle, a fractured pelvic bone, and a traumatic brain injury, among other things. Any one of these injuries alone would satisfy a "substantial bodily injury." Schwartz's multiple injuries substantially exceed a temporary but substantial disfigurement or impairment of a bodily function. Schwartz's multiple fractures and brain injury resulted in her staying in the hospital for a month and using a wheelchair for several months. Schwartz had to engage in physical therapy, she was unable to fully return to her previous activities, and she had to delay going away to college.

---

[53] <u>State v. Pappas</u>, 176 Wn.2d 188, 192, 289 P.3d 634 (2012).

[54] <u>See</u> RCW 9A.04.110(4)(c) ("Great bodily harm" includes "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ.").

A person of reasonable understanding would not have to guess that causing such injuries might subject him or her to a sentence above the standard range.[55] The substantially exceeds aggravator from RCW 9.94A.535(3)(y) was not void for vagueness as applied to Kaestner.

Kaestner also challenges RCW 9.94A.535(3)(t). Section (t) provides for an exceptional sentence when "[t]he defendant committed the current offense shortly after being released from incarceration." Kaestner argues that "shortly after release" is "vague, speculative, and subject to arbitrary enforcement."[56] Although "shortly after" is not defined in the statute,[57] in State v. Murray, our Supreme Court relied on the dictionary definitions of "short" and "shortly."[58] In Murray, the defendant "began reoffending 16 days after being released from King County jail."[59] Our Supreme Court applied the dictionary definitions and determined "A person of reasonable understanding would not have to guess that reoffending 16 days after being incarcerated is within a short time and within the proscribed conduct under the rapid recidivism aggravator."[60]

---

[55] See Duncalf, 177 Wn.2d at 297.

[56] Appellant's Br. at 32.

[57] Our Supreme Court stated, "'Shortly' is defined as 'in a short time: PRESENTLY, SOON.' In turn, 'short' is defined as 'not extended in time: of brief duration: lasting a little while only.'"). Murray, 190 Wn.2d at 737 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2012, 2013 (2002)).

[58] 190 Wn.2d 727, 416 P.3d 1225 (2018).

[59] Id. at 738.

[60] Id. (citing Duncalf, 177 Wn.2d at 297).

Here, Kaestner began reoffending three days after being released from jail. She argues that "her crimes were factually distinguishable from her prior convictions."[61] This is irrelevant. Similarity of offenses is not required to find the rapid recidivism aggravator. It is merely "'additional evidence' of the defendant's disregard for the law.'"[62] The defendant's disregard for the law is "'the gravamen of rapid recidivism.'"[63]

A person of reasonable understanding would not have to guess that reoffending three days after being released from incarceration is within a short time and within the proscribed conduct under the rapid recidivism aggravator.[64] The rapid recidivism aggravator from RCW 9.94A.535(3)(t) was not void for vagueness as applied to Kaestner.

b. *Sufficiency of the Evidence*

Kaestner also contends the State failed to present sufficient evidence to support the aggravators.

As to the substantially exceeds aggravator, Kaestner again relies on Duncalf and the lack of evidence that Schwartz's injuries were permanent. As discussed above, RCW 9.94A.535(3)(y) does not require evidence that the victim's injuries are permanent. Based on the evidence discussed in the vagueness

---

[61] Appellant's Br. at 34.

[62] Murray, 190 Wn.2d at 738 (quoting State v. Combs, 156 Wn. App. 502, 506, 232 P.3d 1179 (2010)).

[63] Id. (quoting Combs, 156 Wn. App. at 506).

[64] See id. (citing Duncalf, 177 Wn.2d at 297).

section above, we conclude the State presented sufficient evidence to support the jury's finding that Schwartz's injuries substantially exceeded substantial bodily harm.

As to the rapid recidivism aggravator, Kaestner relies on State v. Combs to argue the State presented insufficient evidence.[65] In Combs, Division Three of this court held, "[T]he rapid recidivism factor does not apply to an attempting to elude offense committed six months after release from incarceration."[66] The court stated, "Six months is not a short period of time. We do not set an outer time limit on what constitutes a short period of time. That period will vary with the circumstances of the crime involved."[67] The court went on to conclude,

> This case, however, does not present those circumstances. Attempting to elude typically is an impulse crime brought about by circumstances. There was no planning or premeditation. Mr. Combs had been released from custody and was present in Asotin County for six months before this offense. This was not rapid recidivism.[68]

Kaestner argues there is insufficient evidence to support the rapid recidivism aggravator because there is no evidence that she planned this crime and there is no factual connection to her previous convictions. Kaestner contends the crimes are "an indication of mental health issues and not a desire to commit new crimes."[69] But as recognized in Combs, the "gravamen" of rapid recidivism is

---

[65] 156 Wn. App. 502, 232 P.3d 1179 (2010).

[66] Id. at 505.

[67] Id. at 506.

[68] Id. at 507.

[69] Appellant's Br. at 38.

"disdain for the law."[70] RCW 9.94A.535(t) "does not require a connection between the offenses."[71]

Here, Kaestner committed the charged crimes three days after being released from jail. We conclude the State presented sufficient evidence to support the jury's finding that Kaestner committed the crime shortly after being released from incarceration.

## IV. Substantial and Compelling Reasons Justifying Exceptional Sentence

Kaestner argues the court violated her Sixth Amendment right to a trial by jury because the court made an impermissible factual finding. Specifically, Kaestner contends a jury, rather than the court, must find there are substantial and compelling reasons justifying an exceptional sentence.

Kaestner asks us to ignore our Supreme Court's decision in State v. Suleiman[72] and this court's decision in State v. Sage.[73] Under Sage and Suleiman, the question of "whether a court's stated reasons are sufficiently substantial and compelling to support an exceptional sentence" is a question of law.[74] Kaestner contends this is a question of fact.

---

[70] Combs, 156 Wn. App. at 506 (citing State v. Butler, 75 Wn. App. 47, 54, 876 P.2d 481 (1994)).

[71] Id.

[72] 158 Wn.2d 280, 143 P.3d 795 (2006).

[73] 1 Wn. App. 2d 685, 407 P.3d 359 (2017).

[74] Suleiman, 158 Wn.2d at 291, n.3; Sage, 1 Wn. App. 2d at 709.

Under RCW 9.94A.537, the jury is the exclusive finder of fact as to whether the alleged aggravators have been proven beyond a reasonable doubt. Although RCW 9.94A.537(6) provides the court may impose an exceptional sentence "if it finds" the facts found by the jury "are substantial and compelling reasons justifying an exceptional sentence," the trial court is not truly making an impermissible factual determination.

Here, the jury found the State had proven the aggravators beyond a reasonable doubt. At sentencing, the court declared that the jury had found the aggravators beyond a reasonable doubt and that those findings present "substantial and compelling reasons" for an exceptional sentence for the vehicular assault of Schwartz.[75]

Consistent with Suleiman and Sage, we conclude the court did not violate Kaestner's Sixth Amendment right to a jury. The court did not make an impermissible factual finding.

V. Length of Exceptional Sentence

Kaestner contends her sentence for vehicular assault was clearly excessive.

We review whether an exceptional sentence is clearly excessive for abuse of discretion.[76] "A sentence is not clearly excessive unless it is clearly

---

[75] Clerk's Papers (CP) at 264.
[76] State v. Souther, 100 Wn. App. 701, 721, 998 P.2d 350 (2000).

24

unreasonable, that is, it was imposed on untenable grounds or for untenable reasons or is a sentence that no reasonable person would have imposed."[77]

Here, the court sentenced Kaestner to 100 months for the vehicular assault of Schwartz. The standard sentence range for vehicular assault, given Kaestner's offender score, was 43 to 57 months.[78] The court concluded each of the aggravators "standing alone" was "sufficient justification for the length of the exceptional sentence imposed."[79]

Kaestner's argument focuses on her mental health issues. She argues neither she nor the community will benefit from an exceptional sentence because her "mental illness is unlikely to improve while incarcerated."[80] But Kaestner fails to provide any authority to support this argument.

As discussed in the aggravating factors section, given the severity of Schwartz's injuries and the fact that Kaestner committed these crimes only three days after being released from incarceration, the 100-month sentence for the vehicular assault of Schwartz is not clearly excessive. Kaestner fails to show that the trial court abused its discretion by imposing an exceptional sentence.

## VI. DNA Fee

In her reply brief, Kaestner challenges the $100 DNA collection fee imposed by the trial court.

---

[77] Id.
[78] RCW 9.94A.525.
[79] CP at 264.
[80] Appellant's Br. at 49.

At the time of Kaestner's sentencing in 2017, the collection fee was mandatory.[81] In 2018, the legislature amended the DNA collection statute. Under the amendment, the trial court is required to impose the $100 DNA collection fee "unless the state has previously collected the offender's DNA as a result of a prior conviction."[82] And in State v. Ramirez, our Supreme Court held this amendment applies prospectively to cases pending on direct review.[83] At oral argument, the State conceded that Kaestner's DNA was previously collected prior to her sentencing in this case. We accept the State's concession.

Therefore, we affirm Kaestner's conviction and sentence but remand for the trial court to strike the $100 DNA fee.

WE CONCUR:

---

[81] Former RCW 43.43.7541 (2015).

[82] RCW 43.43.7541; H.B. 1783, § 18, 65th Leg., Reg. Sess. (Wash. 2018).

[83] 191 Wn. 2d 732, 747, 426 P.3d 714 (2018).